IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **APRIL M. HERRERA,** | ) | **CASE NO. 7:06CV5016** |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **MIDWEST MEDICAL TRANSPORT CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on the Defendant's Motion for Summary Judgment (Filing No. 52) and Defendant's Motion to Strike Affidavit and Evidence Submitted by Plaintiff (Filing No. 61). For the reasons set forth below, the Motion for Summary Judgment will be granted and the Motion to Strike will be denied as moot.

## FACTS

The Plaintiff, April M. Herrera ("Herrera") is a female resident of North Platte, Nebraska. (Complaint, Filing No. 1, ¶ 5; Answer, Filing No. 5, ¶ 5). Defendant, Midwest Medical Transport Co. ("Midwest"), is a Nebraska corporation with its principal place of business in Columbus, Nebraska. (Complaint ¶ 6; Answer ¶ 6). On April 1, 2004, Midwest opened an office in North Platte. (Defendant's Brief in Support of Motion for Summary Judgment, Filing No. 55, Statement of Facts ("Defendant's Brief") ¶ 1; Plaintiff's Brief in Opposition to Motion for Summary Judgment, Filing No. 59, Statement of Facts ("Plaintiff's Brief") ¶ 1).

Midwest is in the business of transporting patients who require medical attention. On such transports, it is necessary to have a certified and licensed emergency medical technician ("EMT") available at all times to care for the patient. Therefore, a second employee is required to drive the transport vehicle. (Defendant's Brief ¶ 3; Plaintiff's Brief

¶ 3). Midwest maintains a call list of employees who may be asked to assist with patient transportation. Employees who are called for a transport need to be at the North Platte station within ten minutes. (Defendant's Brief ¶ 26; Plaintiff's Brief ¶ 26). After opening its office in North Platte, it was Midwest's goal to employ full-time, certified and licensed EMTs so that two medically trained, certified and licensed personnel would be present on all transports, rather than utilizing only one certified and licensed EMT and an unlicensed driver. (Defendant's Brief ¶ 4; Plaintiff's Brief ¶ 4).

Midwest hired Herrera on July 13, 2004, to work on an "on call" basis. At that time, she was not a certified or licensed EMT. Herrera failed her first EMT certification test, but ultimately passed the test on September 2, 2004, and was licensed as an EMT by the State of Nebraska on November 17, 2004. (Defendant's Brief ¶ 5; Plaintiff's Brief ¶ 5).

On August 12, 2004, Kelley Dailey ("Dailey"), a certified and licensed EMT began to work for Midwest. Dailey (a female) had nine years of experience as an EMT, and was available to work flexible hours when called by Midwest. (Defendant's Brief ¶ 6; Plaintiff's Brief ¶ 6). Also on August 12, 2004, Rob Martinson ("Martinson") began to work full time for Midwest as a certified and licensed EMT. Martinson had worked for Midwest part time since April 5, 2004, and received his state EMT license on June 18, 2004. On August 12, 2004, Midwest had largely achieved its goal of having enough full-time, certified and licensed EMT personnel to permit two EMTs to go on each transport. (Defendant's Brief ¶ 7; Plaintiff's Brief ¶ 7). After August 12, 2004, the number of hours worked by part time employees at Midwest, other than Dailey, was drastically reduced, particularly with respect to part time employees who were not certified and licensed EMTs. (Shullaw Aff. ¶ 20).

On August 12, 2004, Herrera was on a transport with co-workers Dailey and John Noonan ("Noonan"). During the transport, Noonan repeatedly poked Herrera in the right side of her breast. (Defendant's Brief ¶ 13; Plaintiff's Brief, ¶ 13). On August 13, 2004, Jeff Shullaw ("Shullaw"), manager of Midwest's North Platte office, asked Herrera to write a statement about the incident with Noonan. Herrera replied that she did not want to write a statement because she worried about repercussions. Shullaw told Herrera that there would be no repercussions and thanked her for doing what was right. (Defendant's Brief ¶ 15; Plaintiff's Brief ¶ 15). On August 23, 2004, Herrera submitted a brief statement outlining the events of August 12, 2004, and stating that she would be uncomfortable working with Noonan unless he could maintain a professional demeanor toward her. (Defendant's Brief ¶ 16; Plaintiff's Brief ¶ 16). On August 23 or 24, Shullaw spoke to Noonan, and Noonan did not deny the information in Herrera's statement. Shullaw reiterated Midwest's sexual harassment policy to Noonan and informed him that he would receive a formal warning letter. Shullaw informed Noonan that if he were to act in this manner again toward any employee, he would be terminated. Noonan accepted responsibility for his actions and stated that he would apologize to Herrera. On August 24, 2004, Noonan apologized to Herrera, telling her many times that he was sorry. The formal letter of warning was delivered to Noonan on August 25, 2004. (Defendant's Brief ¶ 17; Plaintiff's Brief ¶ 17).

In October 2004, Martinson, Herrera's co-worker, began taking an intermediate EMT class in McCook, Nebraska. Herrera also registered for the class, although Midwest did not require that she take the class, nor did Midwest pay for her tuition or expenses.

Martinson later decided not to car pool with Herrera. (Defendant's Brief ¶¶ 30-31; Plaintiff's Brief ¶ 30-31).

On November 5, 2004, Herrera filed a charge of sex discrimination (harassment) and retaliation with the Nebraska Equal Employment Opportunity Commission ("NEOC"), alleging that she was sexually harassed by Noonan and that Midwest retaliated against her for reporting the harassment, by reducing her hours and not calling her to work. (Filing No. 54-23, p.3).

At some time after November 5, 2004, Keith Gorman, another of Herrera's co-workers, began to contact Herrera on her cell phone, including text messaging. Gorman discussed things of a sexual nature, and offered to pay Herrera $150 to perform oral sex. (Defendant's Brief ¶ 20; Plaintiff's Brief ¶ 20). Gorman's employment with Midwest ended on November 21, 2004. (Defendant's Brief ¶ 21; Plaintiff's Brief ¶ 21). Although Herrera showed one of Gorman's text messages to a co-worker, at no time did she notify Midwest's management about Gorman's conduct. (Deposition of April M. Herrera, Filing No. 54-16 ("Herrera Depo.") 121:25 to 123:3).

On December 22, 2004, Herrera filed a second charge with the NEOC, describing Gorman's offer to pay her $150 for oral sex, and alleging retaliation by Midwest due to the filing of her first charge of discrimination and retaliation. ((Filing No. 54-23, p.2). Herrera alleged that Midwest told other employees not to talk to her and noted that a co-worker declined to car pool with her. (*Id.*).

On January 17, 2005, Herrera's CPR certification expired, which prohibited her from working as an EMT until she could obtain re-certification. (Defendant's Brief ¶ 27; Plaintiff's Brief ¶ 27). Also in January of 2005, Herrera began employment with Wal-Mart in North

Platte.  (Defendant's Brief ¶ 26; Plaintiff's Brief ¶ 26).  When working at Wal-Mart, Herrera received calls from Midwest employees, asking if she was available to assist with transports, but she was not available to respond to the calls.  (Herrera Depo. 107:23 to 11:9).  It was Midwest's policy that if an employee needed assistance of an on-call employee to assist with a transfer, those with EMT certification and license should be contacted first.  (Affidavit of Jeff Shullaw, Filing No. 54-17 ("Shullaw Aff.") ¶ 21).

On February 10, 2005, Herrera was called to work a four-hour shift to assist with a special project of scanning documents.  During that four-hour shift, Herrera spent 66 minutes on her cell phone, making personal phone calls.  (Defendant's Brief ¶ 32; Plaintiff's Brief ¶ 32).

On February 17, 2005, Herrera was scheduled to work at Midwest and did not appear at her scheduled time.  Shullaw called Herrera, and she arrived at work in response to the phone call.  Shullaw then delivered a letter of discipline to Herrera, and discussed with her the alleged violations set forth in the letter. (Shullaw Aff.  ¶ 21 and Exhibit 3 to Affidavit).  The letter of discipline made reference to the  personal phone calls Herrera made on February 10, 2005, and alleged that Herrera performed her work poorly on that date.  The letter also included the following allegations:  (1) that Herrera misrepresented to Shullaw the status of her authorization to provide certain advanced emergency medical services and, when caring for a patient during an advanced life support transfer, spent more than half the "patient care time" using her cell phone for personal calls, placing the patient's life in danger; (2) that Herrera engaged in personal cell phone conversations for approximately one hour while driving an ambulance; (3) that Herrera and another employee took an ambulance to a bar; (4) that Herrera "may have" taken confidential

5

records from the Midwest office; (5) that Herrera failed to complete a time sheet; (6) that Herrera failed to complete her CPR certification; and (7) that Herrera exhibited a rude and unprofessional demeanor and attitude while working for Midwest. Shullaw imposed a disciplinary sanction of one-week suspension without pay. (*Id.*). Because Herrera was working one four-hour shift per week, the one-week suspension equated to a four-hour suspension. (Shullaw Aff. ¶ 27; Defendant's Brief ¶ 34; Plaintiff's Brief ¶ 34).

On April 15, 2005, Herrera filed a third charge with the NEOC, again alleging retaliation by Midwest. (Filing No. 54-23, p. 3). Herrera again described Gorman's phone call offering her $150 for oral sex and the co-worker's refusal to car pool with her, and alleged that Midwest was failing to call her to work. Herrera also alleged that Shullaw retaliated against her by presenting her with the February 17, 2005, letter of discipline. (*Id*).

In May 2005, Herrera relocated to McCook, Nebraska, a one-hour drive from North Platte. (Defendant's Brief ¶ 26; Plaintiff's Brief ¶ 26).

On March 7, 2006, the NEOC issued findings of No Reasonable Cause with respect to Herrera's initial charges of sexual harassment and retaliation, and her subsequent charges of retaliation. (Filing No. 54-23, pp. 4, 5, 8, and 9). With respect to all of Herrera's charges, the NEOC found insufficient evidence to support her allegations.

On July 14, 2006, Herrera filed a Complaint in this Court, alleging sex discrimination and retaliation. Herrera's claim of sex discrimination is based solely on two interactions involving co-workers: the August 12, 2004 incident involving Noonan, and the phone calls and text messages sent by Gorman. (Defendant's Brief ¶ 11; Plaintiff's Brief ¶ 11). Herrera's claim of retaliation is based on (1) a reduction in calls to work and station hours,

(2) Martinson's refusal to car pool with her, and (3) the letter of discipline and four-hour suspension.  (Defendant's Brief ¶ 22, Plaintiff's Brief ¶ 22).

## STANDARD OF REVIEW

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law.  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.*

While there is no discrimination case exception to the application of Fed.R.Civ.P. 56, "we must exercise particular caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117–8 (8th Cir. 2006) (citations omitted).    Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.  *Id.*

## DISCUSSION

### *Motion to Strike*

Midwest has moved to strike the "affidavit" of April M. Herrera (Filing No. 60-2), the exhibits attached to the affidavit (Filing No. 60-3 and 60-4), and all corresponding references in the Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment (Filing No. 59) as well as any statements in the Plaintiff's Brief that are hearsay, lacking in foundation, or not properly supported by pinpoint references to the evidentiary record.

The "Affidavit" of April M. Herrera (Filing No 60-2) is not signed, not dated, not notarized, and contains no indication of the county in which the affidavit purports to have been executed. In fact, because the Index of Evidence (Filing No. 60) noted that the affidavit *is* unsigned and stated that "Plaintiff requests leave to file a fully executed affidavit" at some unspecified future date, it is apparent that Herrera had not executed any affidavit at the time of the filing of the Index of Evidence.

NECivR 7.1(b)(2)(C) states:

> Any documents filed with the index must be identified and authenticated by affidavit. The affidavit must be made on personal knowledge, set forth such facts as would be admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated therein, and identify the motion in connection with which the affidavit it filed.

This Court's Civil Administrative Procedures for electronic filing provide:

> II.C.1: If the original document requires the signature of a non-attorney, the filer may scan and upload the signed document to the System. Alternatively, the filer may electronically file the document with the non-attorney signature or signatures represented by an 's/' and the name typed in the space where the signature or signatures would otherwise appear. . . . b. The filer must

8

>   maintain the original signed document in paper form until all time periods for appeal have expired.

The document at Filing 60-2 captioned "Affidavit of April Herrera" is not an affidavit and does not comply with this Court's local rules or its administrative procedures. Counsel for the Plaintiff did not file any motion requesting leave to submit Herrera's affidavit out of time, and any such motion or affidavit now would be untimely.[1]  Even if the "affidavit" had been properly executed, it does not lay foundation for the documents attached to it. Specifically, the Plaintiff attempts to offer call logs and schedules purportedly used "in the normal course of business" by Midwest from July 24, 2004, to September 24, 2004, and from June 24, 2004, to December 11, 2004. It appears that the documents are offered under the hearsay exception provided in Fed. R. Ev. 803(6); however the "affidavit" supplies none of the requisite information for the admission of the records.

Accordingly, the "affidavit" (Filing No 60-2) and the attachments (Filing 60-3 and 60-4) are not accorded any weight in the Court's consideration of the pending Motion for Summary Judgment. References to such documents in the Plaintiff's Brief in Opposition to the Motion for Summary Judgment, and any assertions of fact not supported by references to the record in compliance with the Court's local rule NECivR 56.1(b), similarly carry no weight.

---

[1] On June 8, 2007, the Plaintiff did file a signed affidavit of April Herrera (Filing No. 64). However, the affidavit was submitted out of time, without leave of Court, and does not lay foundation for the exhibits attached to it. Even if I were to accept the affidavit into the evidentiary record, it would not alter my analysis of the Defendant's Motion for Summary Judgment or my conclusion that judgment should be entered for the Defendant.

9

## *Motion for Summary Judgment*

### *Sex Discrimination Claim*

Herrera acknowledges that her sex discrimination claim is based solely on two interactions: (1) the August 12, 2004, incident involving co-worker Noonan, and (2) the comments by telephone and text messages made by Gorman. (Defendant's Brief ¶ 11; Plaintiff's Brief ¶ 11). Although the Plaintiff's claim of sex discrimination in her Complaint is worded broadly,[2] it is apparent that her claim of sex discrimination is one of sexual harassment/hostile work environment.

To establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must demonstrate that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006)(citing *McCowan v. St. John's Health Sys., Inc.,* 349 F.3d 540, 542 (8th Cir. 2003).

While Herrera has demonstrated that she belongs to a protected group (female), that she was subjected to unwelcome harassment by Noonan and Gorman, and that the harassment was based on her sex, she has not demonstrated that the harassment affected any term, condition or privilege of her employment, nor has she demonstrated that Midwest knew or should have known of the harassment and failed to take appropriate action.

---

[2] "Defendant has willfully discriminated against Plaintiff on the basis of her sex by treating her unequally, harassing her and subjecting her to a hostile work environment." Complaint, Filing No. 1, ¶ 30.

To demonstrate that harassment has affected a term, condition or privilege of employment, a plaintiff must make "a high evidentiary showing that the plaintiff's workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007)(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), and citing *Nitsche v. CEO of Osage Valley Elec. Co-op*, 446 F.3d 841, 846 (8th Cir. 2006)(requiring hostile work environment plaintiff to "clear a high threshold to demonstrate actionable harm")). Lower courts must apply "demanding harassment standards" when considering hostile work environment claims. *Al-Zubaidy v. TEK Indust., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005). "Title VII's purpose is not to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1077 (8th Cir. 2006).

Herrera has not demonstrated that Noonan's conduct of August 12, 2004, nor Gorman's phone calls and text messages of mid-November 2004, permeated her workplace with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Neither has she demonstrated that Midwest failed to take appropriate and effective action when made aware of Noonan's misconduct, or that Midwest knew or should have known of Gorman's communications. The undisputed evidence demonstrates that Midwest encouraged Herrera to report Noonan's conduct; Midwest took prompt disciplinary action against Noonan in response to Herrera's report; and Herrera had no subsequent problems with Noonan. The undisputed evidence also shows that Herrera did

11

not notify anyone in a management position at Midwest about the inappropriate communications she received from Gorman. Accordingly, Herrera's allegations of sex discrimination based on sexual harassment/hostile work environment must fail.

*Retaliation Claim*

Because there is no direct evidence of retaliation by Midwest, the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), governs Herrera's retaliation claim. *See Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir. 2007), citing *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980).  As in a Title VII discrimination claim, in a retaliation claim the plaintiff bears the burden of establishing a prima facie case. *Id.,* citing *Higgins v. Gonzalez*, 481 F.3d 578, 584 (8th Cir. 2007).  To establish such a claim, a plaintiff must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Id.,* citing *Higgins*, 481 F.3d at 589 (citing *Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405, 2415 (2006)).  An allegedly retaliatory action is materially adverse if "a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions."  *Id.*, quoting *Burlington Northern*, 126 S. Ct. at 2412-13.  If a plaintiff makes a prima facie case, then the defendant must "'articulate a legitimate, non-discriminatory reason'" for its actions. *Id.*, quoting *Womack,* 619 F.2d at 1296.  The burden then shifts back to the plaintiff to show "'the proferred justification was in fact a pretext, a cover up for retaliation.'" *Id.*

Herrera alleges that Midwest retaliated against her for opposing sex discrimination and harassment when (1) Midwest reduced her calls to work and her station hours, (2) a

12

co-worker declined to car pool with her to a class in McCook, Nebraska, and (3) she received a written warning and a suspension for one four-hour shift on February 17, 2005. (Herrera Depo. 147:25 to 148:25; Defendant's Brief ¶ 22, Plaintiff's Brief ¶ 22). This Court concludes that a co-worker's refusal to car pool with a plaintiff – particularly a refusal to car pool to an activity outside of work – is not an action that a reasonable employee would consider materially adverse. In other words, even if Martinson's decision not to car pool with Herrera to the training class was motivated by fear that he would be fired if he associated with Herrera, the loss of such a ride-sharing arrangement was not the kind of adverse consequence that would dissuade a reasonable employee from bringing a complaint of discrimination or harassment. Accordingly, only Herrera's claims of (1) reduced calls to work and station hours, and (2) the written warning and four-hour suspension will be addressed.

### 1. Reduced Calls to Work and Station Hours

Herrera contends that her calls to work at Midwest were reduced in retaliation for her complaint of sexual harassment and the filing of her charges with the NEOC. In response, Midwest has come forward with legitimate, non-discriminatory reasons for the reduction in calls. Specifically, Midwest has demonstrated that on August 12, 2004, Midwest hired a licensed and certified EMT (Dailey) and, on the same day, a second licensed and certified EMT (Martinson) began to work full time for Midwest. At that time, Herrera had not passed her EMT test and was not certified as an EMT. Although she ultimately obtained her EMT license on November 17, 2004, it lapsed on January 17, 2005, when she failed to maintain her CPR certification. Midwest has further demonstrated that Herrera failed to respond to calls after she began work at Wal-Mart in January of 2005,

13

and, in May of 2005, she moved to a town located an hour's drive from North Platte. Herrera has not met her burden of coming forward with evidence to demonstrate that Midwest's reasons for the reduction in her calls to work were a pretext for retaliation.

### 2. Written Warning and Four-Hour Suspension

Herrera acknowledges that during her four-hour shift on February 10, 2005, she spent 66 minutes on her cell phone, making personal calls. (Plaintiff's Brief ¶ 32). Some of the calls concerned her purchase of a computer, one was a "wake-up call," at least one call was to the Nebraska Department of Health and Human Services concerning "daycare issues," and a majority of the time was spent talking to her sister, because Herrera "felt uncomfortable in the workplace." (*Id.*). Although Herrera states that she "disputed the incidents" in the letter of discipline when she met with Shullaw on February 17, 2005 (*id.*), she does not present any evidence to counter the allegations in the letter. For example, there is no affidavit from Herrera stating which allegations in the letter, if any, are false.

Accordingly, Midwest has met its burden of coming forward with legitimate, non-discriminatory reasons for the written warning and suspension imposed on Herrera in February of 2005, and Herrera has not met her burden of demonstrating that Midwest's rationale was a pretext for retaliation.

## CONCLUSION

There are no genuine issues of material fact with respect to Herrera's claim of sex discrimination (sexual harassment/hostile work environment) nor her claim of retaliation, and the Defendant, Midwest, is entitled to judgment in its favor as a matter of law.

IT IS ORDERED:

1.      The Defendant Midwest Medical Transport Co.'s Motion for Summary Judgment (Filing No. 52) is granted;

2.      The Defendant Midwest Medical Transport Co.'s Motion to Strike Affidavit and Evidence Submitted by Plaintiff (Filing No. 61) is denied as moot; and

3.      A separate Judgment will be entered dismissing the Plaintiff's Complaint, with prejudice.

DATED this 12th day of June, 2007.

> BY THE COURT:
>
> s/Laurie Smith Camp
> United States District Judge